UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SCOTT BABJAK, | |
| Plaintiff, | Case No. 17-cv-6696 |
| v. | |
| ABBVIE, INC., | Judge John Robert Blakey |
| Defendant. | |
| TOM CHRISTIE, | |
| Plaintiff, | Case No. 17-cv-6919 |
| v. | |
| ABBVIE, INC., | Judge John Robert Blakey |
| Defendant. | |
| DOUG SCHAUMBURG, | |
| Plaintiff, | Case No. 17-cv-7165 |
| v. | |
| ABBVIE, INC., | Judge John Robert Blakey |
| Defendant. | |
| JAMES WARING, | |
| Plaintiff, | Case No. 17-cv-7166 |
| v. | |
| ABBVIE, INC., | Judge John Robert Blakey |
| Defendant. | |

1

| | |
|---|---|
| JACK BAUERLE, | |
| Plaintiff, | Case No. 17-cv-7283 |
| v. | |
| ABBVIE, INC., | Judge John Robert Blakey |
| Defendant. | |
| KATE MCKINLEY, | |
| Plaintiff, | Case No. 17-cv-8255 |
| v. | |
| ABBVIE, INC., | Judge John Robert Blakey |
| Defendant. | |
| MICHAEL COLEMAN, | |
| Plaintiff, | Case No. 17-cv-8259 |
| v. | |
| ABBVIE, INC., | Judge John Robert Blakey |
| Defendant. | |

## **MEMORANDUM OPINION AND ORDER**

In seven related cases, Plaintiffs Scott Babjak, Tom Christie, Doug Schaumburg, James Waring, Jack Bauerle, Kate McKinley, and Michael Coleman sued Defendant AbbVie, Inc.—their former employer—alleging that Defendant fired them in violation of the anti-retaliation provision of the False Claims Act (FCA). This Court consolidated briefing for all seven cases, and in February 2018 Defendant moved to dismiss every complaint for failure to state a claim. [27]. This Court

2

granted that motion without prejudice. [42]. Plaintiffs filed their first amended complaints in May 2018, and this Court subsequently granted Plaintiffs leave to file second amended complaints, which they filed on August 6, 2018. On September 5, 2018, Defendant again moved to dismiss every complaint for failure to state a claim. [54]. For the reasons explained below, this Court grants Defendant's motion in its entirety.

I. The Complaints' Allegations[1]

This Court incorporates by reference, and presumes familiarity with, its prior opinion addressing Defendant's motion to dismiss Plaintiffs' complaints, [42], and thus only briefly revisits the facts from which the parties' claims arise.

Plaintiffs previously worked for Defendant as pharmaceutical sales managers. [SB] ¶¶ 6–7. Specifically, they managed teams selling Lupron, a drug covered under Medicare. *Id*. ¶¶ 7–8, 26. Before Defendant fired them, each Plaintiff had a successful career in sales and consistently received positive performance reviews. [KM] ¶ 10; [DS] ¶ 8.

In 2012, Defendant entered into a Corporate Integrity Agreement (CIA) with the Department of Health and Human Services (HHS) Office of the Inspector General (OIG). [DS] ¶ 10. The OIG uses CIAs to improve the quality of health care and promote compliance to health care regulations. *Id*. According to Plaintiffs, Defendant

---

[1] In this opinion, citations to docket numbers refer to filings in Babjak's case, No. 17-cv-6696. This Court cites to each Plaintiff's second amended complaint by his or her respective initials. Because Plaintiffs' complaints contain virtually identical allegations about Defendant's business and their work for Defendant, this Court, when possible, cites one complaint for a proposition that applies equally to all Plaintiffs.

entered into the CIA to resolve "its criminal and civil liability arising from unlawful promotion of the prescription drug Depakote for uses not approved as safe and effective by the Food and Drug Administration." [SB] ¶ 10. Specifically, Defendant "violat[ed] messaging rules pertaining to the drug." *Id.* ¶ 11. The CIA, in force for five years, required Defendant to have an employee from each business unit certify that they understood the applicable compliance requirements and had "taken steps to promote such compliance." *Id.* ¶¶ 12–14.

Additionally, the CIA required Defendant to provide special training to some employees, which it failed to do. *Id.* ¶¶ 15–17. Most notably, Defendant did not train its sales force on handling pricing discussions with physicians; according to Plaintiffs, drug sales representatives cannot directly discuss profits with physicians, because physicians can use a drug's average sales price (ASP) and Medicare's publicly available reimbursement rates to calculate profits. *Id.* ¶¶ 17, 28. In other words, while "physicians are allowed to perform these profit calculations on their own," sales representatives cannot "sell pharmaceuticals in whole or in part based upon a calculation" of profits, a practice Plaintiffs refer to as "marketing to the spread" or "selling to the spread." *Id.* ¶ 29.

In 2013, Defendant implemented the "Challenger" sales model for Lupron, which required sales representatives to understand their customers' economics and "be bold in discussing price and financials" with physicians. [JB] ¶ 20. Defendant provided "contradictory guidance" as to Challenger: "On the one hand, the standard disclaimer was that part of the Challenger model did not apply to the pharmaceutical

industry," but Defendant also expected the sales team "to challenge customers to stay with Lupron" based upon arguments involving ASP and "responsible pricing." *Id.* ¶ 21. According to Plaintiffs, this "contradictory guidance put employees at risk of violating the law and created an environment that supported 'working without guard rails' between legal and illegal sales.'" *Id.*

At some point during the second half of 2016, Defendant received a letter from Tolmar, the company that manufactures Lupron's main competitor. [SB] ¶¶ 24–25. According to Plaintiffs, the letter accused Defendant of using "illegal sales tactics" that violated the FCA, including "selling to the spread." *Id.* ¶ 24. In response to Tolmar's letter, Defendant's Office of Ethics and Compliance (OEC) began investigating sales practices and any "language used in discussions of Lupron with physicians that might comprise [FCA] violations." *Id.* ¶¶ 32–33.

As discussed in detail in this Court's prior motion to dismiss opinion, [42] at 4–10, OEC interviewed each Plaintiff in this case. [SB] ¶ 34. Notably, Plaintiffs point to three types of related conduct from their interviews as "protected activity" under the FCA: (1) highlighting Defendant's lack of training or recommending more training, *id.* ¶ 50; [JW] ¶ 56; (2) disclosing CIA violations, [JB] ¶ 52; and (3) discussing communications about profits with doctors, or "marketing the spread," [MK] ¶¶ 66–69. For example, Plaintiffs all allege some variation of the following:

> [Plaintiff] engaged in protected activity under the FCA when he reported to [OEC investigator] that [Defendant's] management provided a lack of training and direction that created a culture that allowed for working in a gray area. Moreover, [Plaintiff] engaged in protected activity when he reported to [OEC investigator] how discussions on ASP with physicians were like, helping to illustrate that the allegations in

5

>the Tolmar letter were valid concerns and that the sales force commonly engaged in discussions about ASP [] and responsible pricing.

[SB] ¶ 50.

## II. Legal Standard

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must provide a "short and plain statement of the claim" showing that the pleader merits relief, Fed. R. Civ. P. 8(a)(2), so the defendant has "fair notice" of the claim "and the grounds upon which it rests," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). A complaint must also contain "sufficient factual matter" to state a facially plausible claim to relief—one that "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). This plausibility standard "asks for more than a sheer possibility" that a defendant acted unlawfully. *Williamson v. Curran*, 714 F.3d 432, 436 (7th Cir. 2013). Thus, "threadbare recitals of the elements of a cause of action" and mere conclusory statements "do not suffice." *Limestone Dev. Corp. v. Vill. of Lemont*, 520 F.3d 797, 803 (7th Cir. 2008).

In evaluating a complaint under Rule 12(b)(6), this Court accepts all well-pleaded allegations as true and draws all reasonable inferences in the plaintiff's favor. *Iqbal*, 556 U.S. at 678. This Court does not, however, accept a complaint's legal conclusions as true. *Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009).

### III. Analysis

Plaintiffs claim that Defendant violated the FCA's anti-retaliation provision, 31 U.S.C. § 3730(h), by firing them for reporting to OEC "facts and information providing evidence that placed the endocrinology franchise in jeopardy of violating the FCA," other potential FCA violations, and violations of the CIA. [56] at 4. Defendant argues, as it did in its prior motion to dismiss, [27], that Plaintiffs' claims fail because Plaintiffs do not show that they engaged in protected activity. [55] at 1. Again, this Court agrees.

#### A. The False Claims Act

Congress enacted the FCA to combat financial fraud against the United States. *See Vt. Agency of Natural Res. v. United States ex rel. Stevens*, 529 U.S. 765, 781 (2000). Therefore, the FCA prohibits knowingly presenting "a false or fraudulent claim for payment or approval" to the federal government, 31 U.S.C. § 3729(a)(1)(A), and knowingly making, using, or causing to be made or used "a false record or statement material to a false or fraudulent claim," *id*. § 3729(a)(1)(B). The FCA does not, however, provide "a vehicle for punishing garden-variety breaches of contract" or mere "regulatory violations." *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 2003 (2016).

Plaintiffs seeking relief under the FCA's anti-retaliation provision must show that their employer fired them, suspended them, or otherwise discriminated against them "in the terms and conditions of employment" because of their actions "in furtherance of" an FCA case or "other efforts to stop 1 or more" FCA violations. §

7

3730(h)(1). Thus, Plaintiffs must properly allege that they engaged in conduct protected by the FCA, and that Defendant fired them 'because of" that conduct. *Halasa v. ITT Educ. Servs., Inc.*, 690 F.3d 844, 847 (7th Cir. 2012).

In evaluating whether an employee's conduct qualifies as protected under the FCA, the Seventh Circuit uses a two-pronged inquiry to determine whether: "(1) the employee in good faith believes, and (2) a reasonable employee in the same or similar circumstances might believe, that the employer is committing fraud against the government." *United States ex rel. Uhlig v. Fluor Corp.*, 839 F.3d 628, 624 (7th Cir. 2016) (citing *Fanslow v. Chi. Mfg. Ctr., Inc.*, 384 F.3d 469, 480 (7th Cir. 2004)).

**B. Subjective Prong**

Plaintiffs' second amended complaints fail for the same reason that this Court dismissed their original complaints: they fail to plead that they believed Defendant defrauded the government, rather than violated contractual or other regulatory provisions.

To be sure, Plaintiffs' second amended complaints clearly demonstrate that they believed Defendant violated its CIA with DHHS and/or the regulations that prohibit pharmaceutical sales representatives from discussing profits with physicians. [SB] ¶ 46; [KM] ¶ 63. But, as this Court noted in its prior motion to dismiss opinion, "Plaintiffs offer no explanation to connect their belief in 'garden-variety breaches of contract or regulatory violations' with a good-faith belief that Defendant actually defrauded the government." [42] at 13 (citing *Escobar*, 136 S. Ct. at 2003). In particular, Plaintiffs still fail to allege that Defendant submitted *any*

8

claims to the federal government, much less fraudulent claims. *See* [42] at 13; *United States ex rel. Grant v. Thorek Hosp.*, No. 04 C 8034, 2008 WL 1883454, at *4 (N.D. Ill. Apr. 25, 2008) (finding that plaintiff failed to plead sufficient facts showing she was engaged in a protected activity when she had no knowledge of any false claim being submitted to the government.).

In their response memorandum, Plaintiffs do say that they "believed . . . within the context of their interviews," that Defendant "was in jeopardy of violating the False Claims Act." [56] at 44. But Plaintiffs offer no factual allegations to support this conclusory statement. Instead, Plaintiffs consistently allege that they believed Defendant's "lack of training" or "culture" allowed for "working in the gray area between legal and illegal sales." [SB] ¶¶ 20, 50; [TC] ¶¶ 24, 55–56. Simply put, the FCA does not cover "gray areas"; instead, Congress designed the provision to protect employees who have "made an effort to stop a *violation of the False Claims Act*." [42] at 14 (citing *Reed v. Colo. Technical Univ.*, No. 15-cv-3368, 2016-WL 1019830, at *3 (N.D. Ill. Mar. 15, 2016)).

Again, this Court notes that Plaintiffs behaved laudably by voicing concerns about potential deficiencies, [42] at 14–15, but the FCA's anti-retaliation provision does not cover employees who merely "made an effort to stop a violation of some federal law" or regulation, much less a violation that may fall somewhere "between legal and illegal sales." *Reed*, 2016 WL 1019830, at *3; *see also Rohler v. Rolls-Royce Corp.*, No. 1:10-cv-0254-TWP-TAB, 2012 WL 1098636, at *12 (N.D. Ill. Mar. 30, 2012) (rejecting FCA retaliation claim on summary judgment because Plaintiff was "not

9

certain if any false data was presented to the U.S. government.") (citing *Grant*, 2008 WL 1883454, at *4). Absent any specific allegation that Plaintiffs believed Defendant *actually* violated the FCA and submitted *any* fraudulent claims to the government, rather than operated in a "gray area," this Court cannot find that Plaintiffs believed, in good faith, that Defendant committed fraud against the government.[2] *Uhlig*, 839 F.3d at 624.

## C. Objective Prong

Even if Plaintiffs subjectively believed that Defendant defrauded the government, their claims still fail because they have not satisfied *Uhlig's* "objective prong." Specifically, Plaintiffs fail to sufficiently plead that a reasonable employee "in the same or similar circumstance" might believe that Defendant committed fraud against the government. *See Uhlig*, 839 F.3d at 635. The objective prong looks to the facts that the employee knew "at the time of the alleged protected activity." *Id.* (citing *Fanslow*, 384 F.3d 469, 479–80 (7th Cir. 2004)). This Court analyzes Plaintiffs' three alleged types of protected conduct from their OEC interviews—(1) recommending and highlighting lack of training; (2) disclosing CIA violations; and (3) discussing communications about profits with doctors, or "marketing the spread"—in turn under the objective prong.

---

[2] In response to Defendant's motion, Plaintiffs note the "importance of context" regarding the subjective prong and cite to a Title VII case. [56] at 43 (citing to *Burlington N. & S. F. R. Co. v. White*, 548 U.S. 53 (2006)). But, as this Court explained in its prior motion to dismiss opinion, no court has ever applied Title VII's retaliation standards to FCA retaliation claims, and numerous courts have rejected similar efforts to blur the lines between the two statutes. *See* [42] at 16 (collecting cases).

1. **Training Deficiencies**

First, Plaintiffs allege that they engaged in protected activity under the FCA when they reported to OEC that Defendant "provided a lack of training and direction that created a culture that allowed for working in a grey area." [SB] ¶ 50. But Plaintiffs fail to explain how a reasonable employee might believe alleged training deficiencies demonstrate actual fraud, or even potential fraud, on the government. It is well settled that "making internal complaints or pointing out problems is not sufficient" to constitute FCA protected activity. *United States ex rel. Batty v. Amerigroup Ill, Inc.*, 528 F. Supp. 2d 861, 877 (N.D. Ill. 2007) (collecting cases); *see also Lang v. Nw. Univ.*, 472 F.3d 493, 494−95 (7th Cir. 2006) (The FCA protects only "objectively reasonable reports," not an "employee . . . who just imagines fraud but lacks proof."). Here, Plaintiffs did just that by noting training deficiencies and making requests for increased internal training in their OEC interviews. *See, e.g.*, [SB] ¶ 50 ("Babjak then advised Lee that more training was necessary for salespeople for discussing certain pricing issues"). Simply put, no reasonable employee would believe Defendant's lack of training indicates that Defendant fraudulently sought money from the government. *Uhlig*, 839 F.3d at 635. Therefore, Plaintiffs did not engage in protected activity by advocating for more training.

2. **CIA Violations**

Plaintiffs also allege that they engaged in protected activity by disclosing potential CIA violations in their OEC interviews. [56] at 10. But Plaintiffs Christie, Coleman, McKinley, and Waring fail to allege that they mentioned the CIA in their

11

OEC interviews, and thus cannot claim they participated in protected activity based upon such conduct. And the remaining three Plaintiffs fail to respond to Defendant's argument that the CIA contains no connection whatsoever to the FCA, [55] at 23–26, in their opposition memorandum. *See generally* [56] at 45–46. Thus, Plaintiffs concede this argument, and this Court grants that portion of Defendant's motion to dismiss as unopposed. *See Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) ("Failure to respond to an argument . . . results in waiver.").

### 3. Marketing the Spread

Finally, Plaintiffs cannot explain how a reasonable employee might believe that potential discussions between sales representatives and physicians about "ASP" and "responsible pricing" indicate that Defendant defrauded the government by "marketing the spread." [SB] ¶ 50.

As Defendant correctly notes, it is "impossible to 'market the spread' based on the way the federal government reimburses Lupron." [58] at 3. To be sure, prior to 2003, Centers for Medicare & Medicaid Services (CMS) reimbursed prescription drugs based upon an "Average Wholesale Price," (AWP), which pharmaceutical companies self-reported. *In re Pharm. Indus. Average Wholesale Price Litig.*, 491 F. Supp. 2d 20, 32 (D. Mass. 2007)). AWP "was the average price charged by wholesalers to providers," and CMS calculated reimbursement "from the markup charged by wholesalers over their actual acquisition cost." *Id*. at 33. But due to "consolidation and competition among wholesalers," pharmaceutical companies began to falsely "raise" AWPs, and thus these standard markups on branded drugs "no longer

12

reflected actual wholesaler margins." *Id*. at 33, 36. For example, when "a branded drug faced competition from a therapeutic equivalent . . . the drug manufacturer could manipulate the spread – the difference between the actual selling price and the AWP based reimbursement – to make the drugs more attractive to a physician," thus "marketing the spread" to the physician to "increase sales and market share." *Id*. at 35.

Congress corrected this problem in 2003 by phasing out AWP. [55] at 21; Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Pub. L. No. 108-173, 117 Stat. 2066. *See also Wholesale Price Litig.*, 492 F. Supp. 2d at 30 ("In 2003, Congress finally fixed the problem by moving to a reimbursement system not based on AWP."). Therefore, as the parties both note, CMS reimbursement for drugs such as Lupron is now based upon an average sales price. [SB] ¶ 17; [55] at 21. Unlike AWPs, ASPs are based upon "actual sales data" and are "defined by law." *U.S. v. CSL Behring, L.L.C.*, 855 F.3d 935, 938 (8th Cir. 2017); 42 U.S.C. § 1395w-3a. Thus, Defendant argues that any allegation that it "markets the spread" for Lupron's ASP is fatally flawed. [55] at 21.

Plaintiffs fail to contest this argument. Instead, they merely state that Defendant "attempts to distract the Court by assigning an industry definition to 'marketing the spread' that distinguishes between 'Average Wholesale Price' and 'Average Sales Price'. . . .This is misguided. Plaintiffs use this phrase interchangeably and referred to ASP when using it." [56] at 45.

13

Defendant's theory, however, is not misguided; by law, Defendant could not have engaged in "marketing the spread" based upon Lupon's ASP pricing. Therefore, no reasonable employee would have believed that Defendant engaged in "marketing the spread," thus defrauding the government. Plaintiffs are therefore left with claims that they informed OEC about sales representatives discussing "ASP Erosion"[3] and "responsible pricing" with physicians, and thus that they engaged in protected activity. *See, e.g.*, [TC] ¶ 55. But, as this Court previously noted in response to those same claims, "no reasonable employee could extrapolate from questions about discussing drug prices with physicians to arrive at a belief that Defendant fraudulently sought money from the federal government." [42] at 15 (citing *Uhlig*, 839 F.3d at 635). In short, "[p]ossible regulatory violations? Yes. Defrauding the government? No." *Id*.

In a last effort to avoid dismissal, Plaintiffs argue that because Tolmar sent a letter and Defendant investigated it, this "alone allow[s] a reasonable employee participating in the investigation to believe there was evidence that [Defendant's] sales representatives were selling to the spread." [56] at 46. But this argument fails for the same reason as the claims in *Uhlig*. There, the Seventh Circuit held that a plaintiff who had not read the relevant contracts between his employer and the government, and who had only seen two secondhand emails explaining that the company changed its employment structure to better align "with its contractual requirements," failed to show that a reasonable employee in his position would have

---

[3] Plaintiffs fail to define "ASP Erosion" in their complaints or opposition memorandum.

14

believed that his employer defrauded the government. *Id.* Significantly, the emails did not state the Defendant's contractual obligations to the government, and thus were not enough "to cause someone in Uhlig's position to believe that [the defendant] was defrauding the government." *Id.*

Here, no Plaintiff alleges that he or she actually read the letter. Instead, they all allege some variation of the following:

> [Plaintiff] had multiple conversations about the Tolmar letter with his manager . . . in advance of his interview, and [Plaintiff] learned in these conversations about Tolmar's allegations that AbbVie was engaged in illegal sales tactics that violated the False Claims Act . . . and that this was the focus of the OEC investigation and the upcoming interviews.

[SB] ¶ 34. But just as the *Uhlig* plaintiffs could not rely upon secondhand emails, Plaintiffs cannot rely upon secondhand conversations with their managers; as alleged here, no reasonable employee could extrapolate from secondhand conversations about FCA "allegations" to conclude that Defendant fraudulently sought money from the government by marketing the spread.

Because Plaintiffs' fail to sufficiently plead both the subjective and objective prongs, their conduct cannot qualify as protected activity under the FCA. *Uhlig*, 839 F.3d at 635.

### D. Leave to Replead

Defendant argues that this Court should dismiss Plaintiffs' second amended complaints with prejudice, [55] at 36, and Plaintiffs do not request leave to replead any claims. *See* [56]. Although, in general, Rule 15(a) states that trial courts "should freely give leave [to amend] when justice so requires," that command can be

15

outweighed by factors such as "undue delay, bad faith, and futility." *Fish v. Greatbanc Trust Co.*, 749 F.3d 671, 689 (7th Cir. 2014). After multiple failed attempts, amending their complaint yet again is futile, as Plaintiffs cannot establish that their OEC interviews constituted protected activity. Thus, based upon the record, this Court dismisses Plaintiffs' complaints with prejudice.

## IV. Conclusion

For the reasons explained above, this Court grants Defendant's motion to dismiss each Plaintiff's complaint [54] with prejudice. All dates and deadlines are stricken. Civil case terminated.

Dated: August 11, 2022

Entered:

John Robert Blakey
United States District Judge